**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ECOLAB INC. and ECOLAB USA INC., <br><br> Plaintiffs <br><br> v. <br><br> IBA, INC. and WEBCO CHEMICAL, CORPORATION, <br><br> Defendants. | Civil Action No. 4:24-cv-40107 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WEBCO CHEMICAL CORPORATION'S MOTION TO DISMISS

## <u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ............................................................................................................. 2

    A.   The Still-Pending Minnesota Litigation ............................................................... 2

    B.   Factual Allegations ............................................................................................... 4

III.  LEGAL STANDARD ..................................................................................................... 6

IV.   ARGUMENT .................................................................................................................. 7

    A.   Ecolab's Trade Secret Misappropriation Claims Must Be Dismissed. ......................... 7

        i.    Ecolab Does Not Plead the Existence of a Trade Secret With Sufficient
           Particularity................................................................................................ 7

        ii.   Ecolab's Alleged Trade Secrets Are Public Knowledge. .................................. 10

        iii.  Ecolab Fails to Allege Sufficient Facts Demonstrating That Webco
           Used Ecolab's Alleged Trade Secrets................................................................ 14

    B.   Ecolab's C. 93a Must Be Dismissed .................................................................... 18

V.    CONCLUSION............................................................................................................... 18

TABLE OF AUTHORITIES

**Cases**

Page(s)

*Ad Lightning Inc. v. Clean.io, Inc.,*
   No. 19-CV-7367 (JPO), 2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) ................................. 17

*Analog Techs., Inc. v. Analog Devices, Inc.,*
   105 F.4th 13 (1st Cir. 2024) ................................................................................................. 15

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ........................................................................................................... 6, 7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................................... 6, 7

*Blake v. Pro. Coin Grading Serv.,*
   898 F.Supp.2d 365 (D. Mass. 2012) ...................................................................................... 9

*Ecolab, Inc. v. IBA, Inc.,*
   File No. 22-cv-479 (ECT/DTS), 2024 WL 3440198 (D. Minn. Jul. 17, 2024) ................... 3, 4

*Ferring Pharms. Inc. v. Braintree Lab'ys, Inc.,*
   38 F.Supp.3d 169 (D. Mass. 2014) ........................................................................................ 8

*Flexible Techs., Inc. v. SharkNinja Operating LLC,*
   No. 18-348-CFC, 2019 WL 1417465 (D. Del. Mar. 29, 2019) ......................................... 8, 10

*IDX Sys. Corp. v. Epic Sys. Corp.,*
   285 F.3d 581 (7th Cir. 2002) ................................................................................................. 9

*In re Colonial Mortg. Bankers Corp.,*
   324 F.3d 12 (1st Cir. 2003) ................................................................................................... 5

*Incase Inc. v. Timex Corp.,*
   488 F.3d 46 (1st Cir. 2007) ............................................................................................... 7, 14

*Insulet Corp. v. EOFlow, Co.,*
   104 F.4th 873 (Fed. Cir. 2024) ........................................................................................... 14

*Lithero, LLC v. Astrazeneca Pharm. LP,*
   2020 WL 4699041 (D. Del. Aug. 13, 2020) ........................................................................... 8

*Maldonado v. Fontanes,*
   568 F.3d 263 (1st Cir. 2009) ........................................................................................ 2, 7, 17

*MedQuest Ltd. v. Rosa,*
No. 21 CIV. 5307 (PGG), 2023 WL 2575051 (S.D.N.Y. Mar. 20, 2023)............................ 17

*Mizuho Orthopedic Sys., Inc. v. Allen Med. Sys., Inc.,*
610 F.Supp.3d 367 (D. Mass. 2022) .................................................................................. 5

*Moog, Inc. v. ClearMotion, Inc.,*
Civil No. 1:19-cv-12066-IT, 2020 WL 6162921 (D. Mass. Oct. 21, 2020)..................... 7, 11

*My Mavens, LLC v. Grubhub, Inc.,*
No. 20 CIV. 4657 (PGG), 2023 WL 5237519 (S.D.N.Y. Aug. 14, 2023) ............................ 15

*Oakwood Laboratories, LLC v. Thanoo,*
No. 17-CV-05090(PGS), 2017 WL 5762393 (D.N.J. Nov. 28, 2017) .................................. 10

*Phazr, Inc. v. Ramakrishna,*
No. 3:19-CV-01188-X, 2020 WL 5526554 (N.D. Tex. Sept. 14, 2020) ........................ 15, 17

*Pietrantoni v. Corcept Therapeutics Inc.,*
640 F.Supp.3d 197 (D. Mass. 2022) .................................................................................. 5

*Ruckelhaus v. Mosanto Co.,*
467 U.S. 986 (1984).......................................................................................................... 8

*SB Holdings, LLC v. Vivint Smart Home, Inc.,*
No. 20-886, 2021 WL 1721715 (E.D. Tex. Apr. 30, 2021)................................................ 5

*Schatz v. Republican State Leadership Comm.,*
669 F.3d 50 (1st Cir. 2012)............................................................................................... 6

*SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC,*
491 F.3d 350 (8th Cir. 2007) ........................................................................................... 14

*Spear Mktg., Inc. v. BancorpSouth Bank,*
791 F.3d 586 (5th Cir. 2015) ........................................................................................... 15

*Sutra, Inc. v. Iceland Express, Ehf,*
No. 04-cv-11360-DPW, 2008 WL 2705580 (D. Mass. July 10, 2008) ................................ 7

*TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo,*
*966 F.3d 46 (1st Cir. 2020)* .............................................................................................. 14

*Torsh Inc. v. Audio Enhancement, Inc.,*
661 F.Supp.3d 596 (E.D. La. 2023).................................................................................... 15

**Statutes**

18 U.S.C. § 1836(b) ............................................................................................................... 1

18 U.S.C.A. § 1839(3)(B) ................................................................................................ 11

M.G.L. c. 93 § 42 ........................................................................................................... 1, 4

Mass. Gen. Laws Ann. ch. 93, § 42(1) ............................................................................ 10

Mass. Gen. Laws Ann. ch. 93, § 42(4)(i) .......................................................................... 11

Mass. Gen. Laws Ann. ch. 93, § 42D ............................................................................. 8, 10

Mass. Gen. Laws Ann. ch. 93, § 42F .................................................................................. 18

Mass. Gen. Laws Ann. ch. 93A ......................................................................................... 18

I.      **INTRODUCTION**

This action is the latest step in Plaintiffs Ecolab Inc. and Ecolab USA Inc.'s ("Ecolab")

protracted campaign to manufacture a baseless misappropriation of trade secrets claim against

Defendant Webco Chemical Corporation ("Webco") relating to a class of drug products known

as "teat dip"—a chemical mixture applied to the teats of lactating cows to control the spread of

bovine mastitis.[1]  Having tried and failed to sue Webco in the U.S. District Court for the District

of Minnesota, Ecolab now attempts to bring broader, but still baseless, claims in Massachusetts.

Ecolab alleges that it disclosed confidential information that included "trade secrets" to

Webco and Defendant IBA, Inc. ("IBA") pursuant to a decades-old license agreement between

Ecolab and IBA for the manufacture and distribution of certain of Ecolab's teat dip products.

Ecolab further alleges that IBA and Webco then used these alleged trade secrets to develop

competitive teat dip products.  Ecolab asserts claims for the misappropriation of trade secrets

under the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836(b), and the Massachusetts

Uniform Trade Secrets Act ("MUTSA"), M.G.L. c. 93 § 42 *et seq*, as well as for a violation of

Chapter 93A.

Critically absent from Ecolab's Complaint, however, are allegations sufficient to support

its claim that any of the information it seeks to protect rises to the level of trade secret.  The

license agreement Ecolab appends to its Complaint makes clear that much—if not all—of the

Ecolab information relating to teat dip formulations was covered by publicly available patents,

not trade secrets.  *See* ECF No. 1-1, at p. 15 ("Exhibit A PATENT RIGHTS").  And Ecolab

never discloses that those patents and the patents that followed all expired, which forced Ecolab

---

[1] U.S. Food & Drug Administration Compliance Policy Guide (CPG) Sec. 654.200 (March 1995).

to compete for teat dip sales without its patent monopoly. Instead of facing that challenge head on, Ecolab filed suit in the U.S. District Court for Minnesota, and now here, all in an effort to box out the competition with gauzy claims of trade secret misappropriation relating to general categories of information already known to the agricultural industry or readily ascertainable from public information from the expired patents, among myriad other sources. None of that public or readily ascertainable information qualifies as trade secrets as a matter of law.

Not only that, but Ecolab also fails to adequately allege facts—as opposed to naked conclusions—to support its claim that Webco actually used Ecolab's alleged trade secrets to develop competitive products. Instead, Ecolab suggests that because Webco had access to Ecolab's alleged trade secrets during the course of the license agreement with IBA, it ***must have*** used them to develop competitive teat dip products. But Webco's knowledge and development of teat dip products pre-dates, and is independent of, the license agreement between Ecolab and IBA, and Ecolab fails to allege facts that would properly permit the inference that Webco used Ecolab trade secrets to formulate or manufacture competitive teat dip products. Because Ecolab's allegations do not allow the Court to infer more than a "mere possibility" of misconduct, they are insufficient to state a claim for relief. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). For these reasons, and for the reasons set forth below, the Court should dismiss Ecolab's claims against Webco.

## II.   <u>BACKGROUND</u>

### A.   **The Still-Pending Minnesota Litigation**

Ecolab initially sued IBA in the U.S. District Court for the District of Minnesota in February 2022 (the "Minnesota Action"). *See Ecolab Inc. et al. v. IBA, Inc. et al.*, No. 22-cv-00479-ECT-DTS (D. Minn.). Minn. Action, ECF No. 1. Over a year later, Ecolab filed a Motion

to Amend its Complaint to add Webco and another third-party manufacturer, Custom Chemical Formulators, Inc. ("Custom Chemical") as defendants.  Minn. Action, ECF No. 61.

In its Amended Complaint, Ecolab asserted claims for the misappropriation of trade secrets under the DTSA and the Minnesota Uniform Trade Secrets Act.  Minn. Action, ECF No. 179 at 5-6 (Order on Defendants' Motion to Dismiss).  Ecolab also asserted claims against IBA for breach of the license agreement, which it claims was extended to January 6, 2022, trademark infringement, and unfair competition under the Lanham Act and Minnesota law.  *See Ecolab, Inc. v. IBA, Inc.*, File No. 22-cv-479 (ECT/DTS), 2024 WL 3440198, at * 5 (D. Minn. Jul. 17, 2024).

Webco and Custom Chemical promptly moved to dismiss Ecolab's claims, arguing that the district court lacked personal jurisdiction over them in Minnesota.  The district court agreed and dismissed Webco and Custom Chemical from the case on October 26, 2023.  Minn. Action, ECF No. 179 at 28 (Order on Defendants' Motion to Dismiss).

Also in the Minnesota Action, Ecolab sought discovery concerning IBA's development and manufacturing of teat dip products IBA developed after it told Ecolab the licensing relationship was over (the "Non-Ecolab Products").  *Ecolab, Inc. v. IBA, Inc.*, 2024 WL 3440198 at * 4.  IBA resisted that discovery, arguing that Ecolab's Amended Complaint only relates to how and when IBA sold Ecolab-branded products, and IBA asked the Minnesota Court to prevent Ecolab from accessing information about its independently developed products' development, formulation, customers, and sales.  *Id.*

After briefing and hearing, the Magistrate Judge denied Ecolab's motion to compel discovery on the Non-Ecolab Products, holding that Ecolab is not entitled "to discovery regarding the development or manufacturing of such products."  *Id.*  Over Ecolab's objection, the District Judge affirmed that part of the Magistrate Judge's order denying Ecolab discovery concerning

"IBA's alleged use to Ecolab's trade secrets to develop and manufacture non-Ecolab-branded acidified sodium chlorite (or 'ASC') bovine teat dip products." *Id.* at *1.

Less than a month later, and with claims against IBA in the Minnesota Action still pending, and discovery (including third-party discovery involving Webco) ongoing, Ecolab filed the instant lawsuit against Webco and IBA.  ECF No. 1.  Ecolab again asserts a claim for the misappropriation of trade secrets under the DTSA, along with claims for the misappropriation of trade secrets under the MUTSA, M.G.L. c. 93 § 42 *et seq*, and a violation of Chapter 93A.  *Id.*

### B.    Factual Allegations

Similar to its pending claims in Minnesota, Ecolab alleges that it provides products and services to dairy farms and dairy processing customers, including "acidified sodium chlorite (ASC) teat dip products."  *See* Compl. ¶ 1, ECF No. 1.  Ecolab alleges that it and its predecessor, Alcide Corporation ("Alcide"), "spent years developing and improving" ASC teat dip products, as well as "methods" of manufacturing, testing, and ensuring the "efficacy and quality" of such products. *Id.* ¶ 2.

Ecolab alleges that in 2002, Alcide entered into a license agreement with IBA to "facilitate" the distribution and manufacture of Alcide's (later, Ecolab's) teat dip products.  *Id.* ¶¶ 25, 27 & Ex. A.  The license agreement recites that "Alcide has certain valuable patent rights, trademark rights, technical data and information relating to products intended for use in the prevention of mastitis in dairy cattle."  *Id.* at Ex. A (ECF No. 1-1).  Pursuant to the license agreement, Ecolab claims that it disclosed to IBA certain information that Ecolab now claims are trade secrets.  *Id.* ¶¶ 25-28.  The alleged trade secrets include "product specifications" and "methods of manufacture" of teat dip products; "sources" of and "specifications" for raw materials used in the manufacture of the products; test methods and testing specifications, batch specifications, batch cards, and

historical batch testing statistics for the products; packaging specifications for the products; and "bills of materials and commercialized formulas" related to the manufacture of the products.  *Id.* ¶ 21.  Ecolab further alleges that in connection with the license agreement, IBA disclosed Ecolab's alleged trade secrets to Webco, subject to certain duties of confidentiality, so that Webco could manufacture the teat dip products for IBA.  *Id.* ¶¶ 26, 29.

Ecolab alleges that Webco is a Massachusetts corporation that manufacturers various chemical products for its customers.  *Id.* ¶¶ 10-11.  As relevant here, and as Ecolab knows from the filings in the Minnesota action, Webco has designed, manufactured and sold industrial cleaning products, personal care products, and animal care products, including products for the bovine and equine industries, for decades.  Minn Action, ECF No. 79.  ***Years before*** the 2002 license agreement between Ecolab and IBA, Webco was named as the assignee of U.S. Patent No. 6,107,344 (the "'344 patent") ("Aqueous Germicidal Film Forming Composition for Applying to Teats of Dairy Cows") which covers teat dip and describes the state of the art for reducing or preventing mastitis as of 1999.[2]  Minn Action, ECF No. 110.

Nevertheless, Ecolab alleges "upon information and belief" that, at some unspecified point in time, IBA and Webco began using Ecolab's trade secrets "in connection with" the development of non-Ecolab-branded teat dip products named "Ultra-Guard HV, Pro-San, Pre-Sept, and Opti-

---

[2] On a motion to dismiss, courts may "consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice." *Pietrantoni v. Corcept Therapeutics Inc.*, 640 F.Supp.3d 197, 204 (D. Mass. 2022) (quoting *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).  Courts "routinely take judicial notice of patents, prosecution history and patent applications."  *Mizuho Orthopedic Sys., Inc. v. Allen Med. Sys., Inc.*, 610 F.Supp.3d 367, 379 (D. Mass. 2022) (quoting *SB Holdings, LLC v. Vivint Smart Home, Inc.*, No. 20-886, 2021 WL 1721715, at *1 (E.D. Tex. Apr. 30, 2021)). The Court may take judicial notice of this patent and the other public records referenced herein.

Guard." Compl. ¶¶ 32, 33-36, 44. Ecolab claims these Non-Ecolab Products are marketed as equivalent to certain of Ecolab's teat dip products. *Id.* ¶¶ 32, 33-36, 44.

Ecolab does not allege any specific facts to support a claim that Webco actually used protectable, specific Ecolab trade secrets in developing the Non-Ecolab Products. Instead, Ecolab alleges that IBA and Webco developed Ultra-Guard HV, Pro-San, Pre-Sept, and Opti-Guard in or around the same time period they were also manufacturing Ecolab's teat dip products under the license agreement. *Id.* ¶¶ 37-44. Ecolab further alleges that it took less time for IBA and Webco to develop Ultra-Guard HV, Pro-San, Pre-Sept, and Opti-Guard than it took for Ecolab to develop its own teat dip products at some non-specific point in the past. *Id.* ¶¶ 37-44. Ecolab then summarily declares that IBA and Webco "were only able to launch [the Non-Ecolab Products] so quickly because of their access to and use of [Ecolab's alleged trade secrets.]" *Id.* at 44.

## III.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the Court] to draw on [its] judicial experience and common sense." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

Dismissal is warranted "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Maldonado*, 568 F.3d at 268 (internal quotation marks omitted).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## IV.   ARGUMENT

### A.   ECOLAB'S TRADE SECRET MISAPPROPRIATION CLAIMS MUST BE DISMISSED.

To state a claim under either the DTSA or the MUTSA, a plaintiff must plead facts demonstrating that "(1) the information is a trade secret; (2) the plaintiff took reasonable steps to preserve the secrecy of the information; and (3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret."  *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see Moog, Inc. v. ClearMotion, Inc.*, Civil No. 1:19-cv-12066-IT, 2020 WL 6162921, at *7 (D. Mass. Oct. 21, 2020) ("The standards for misappropriation under the DTSA and the Massachusetts statute are substantially similar.").  Because Ecolab fails to adequately allege the existence of a trade secret and/or Webco's use of any protectable trade secret, its claims must be dismissed.

#### i.   Ecolab Does Not Plead the Existence of a Trade Secret With Sufficient Particularity.

Ecolab fails to plead facts—as opposed to bare conclusions—demonstrating that any of the information it seeks to protect constitutes "a trade secret."  Accordingly, it has not stated a claim for a violation of the DTSA or the MUTSA.

"It is hornbook law that the parties and the court cannot accurately decide the question of whether a trade secret exists without first understanding what precisely is asserted as a secret." *Sutra, Inc. v. Iceland Express, Ehf*, No. 04-cv-11360-DPW, 2008 WL 2705580, at *3 (D. Mass.

July 10, 2008) (internal quotation marks omitted).  Accordingly, a DTSA-plaintiff must "identify a trade secret with sufficient particularity so as to provide notice to a defendant of what [it] is accused of misappropriating and for a court to determine whether misappropriation has or is threatened to occur." *Flexible Techs., Inc. v. SharkNinja Operating LLC*, No. 18-348-CFC, 2019 WL 1417465, at *2 (D. Del. Mar. 29, 2019) (internal quotation marks omitted).  A MUTSA-plaintiff, meanwhile, must "state with ***reasonable particularity*** the circumstances thereof, including the ***nature of the trade secrets*** and the basis for their protection" to maintain a claim. Mass. Gen. Laws Ann. ch. 93, § 42D (emphasis added).

Ecolab does not plead the existence of a trade secret with the requisite particularity. Rather, it simply lists broad categories of information and slaps them with the label of "trade secret."  This is insufficient to state a claim under the DTSA or the MUTSA.

Courts are clear that general references to "entire set[s]" of materials as trade secrets fail to meet the plaintiff's burden.  *Ferring Pharms. Inc. v. Braintree Lab'ys, Inc.*, 38 F.Supp.3d 169, 175 (D. Mass. 2014).  If a plaintiff points only to "large, general areas of information" that was shared with a defendant without identifying any specific trade secrets within, the "[d]efendant is not put on sufficient notice of what it is accused of misappropriating" and the plaintiff therefore "does not adequately plead which, if any, trade secrets were misappropriated."  *Lithero, LLC v. Astrazeneca Pharm. LP*, 2020 WL 4699041, at *2 (D. Del. Aug. 13, 2020).  That is just what Ecolab has done here.

For example, Ecolab claims that "product specifications" and "methods of manufacture" of teat dip products are trade secrets.  Compl. ¶ 21.  But it utterly fails to allege with any particularity what it means by this or how it is claiming trade secret protection on broad categories of information relating to drugs well-known in the agricultural industry.  *Ruckelhaus*

*v. Mosanto Co.*, 467 U.S. 986, 1002 (1984) ("Information that is public knowledge or that is generally known in an industry cannot be a trade secret.").  What types of "specifications" is Ecolab referencing?  USDA specifications?  The chemicals used in teat dip products?  The specific amount of each chemical?  The color of the resulting teat dip?  The Complaint doesn't say.  Nor does Ecolab explain what it means by "methods" of manufacture.  Does it mean the order in which chemicals are combined, the machinery or equipment used to combine them, or the length of time the product is mixed?  The Court and the parties can only speculate what of Ecolab's products are protectable versus basic, publicly available information.[3]

Likewise, Ecolab claims trade secret protection for the "sources" and "specifications" of "raw materials" used in the manufacture of its teat dip products.  *Id.*  But again, Webco has no way of knowing from the Complaint what Ecolab means by "sources" or "specifications" of raw materials.  Does it mean companies and/or vendors who supply component chemicals for teat dips?  Or does it mean the specifications of glycerin, for example, which is a common component of teat dips?  Or does it mean the types and quantities of raw materials Ecolab purchases?  The Complaint has no answers for these fundamental questions either.

Take, as another example, Ecolab's allegation that the "packaging specifications" for its teat dip products purportedly constitute a trade secret.  Compl. ¶ 21.  The Court cannot possibly determine what the purported trade secret is here, let alone whether Webco misappropriated it.  Surely the size of shipping containers or boxes that Ecolab uses to ship its products, or whether Ecolab uses cardboard or plastic to do so, or whether it ships teat dip in white gallon jugs with

---

[3] To be sure, Ecolab need not *actually* disclose its alleged trade secrets in a publically filed complaint.  But neither can it hide behind a list of broad categories of information.  Instead, it must "separate the trade secrets from the other information that goes into any" teat dip product. *See Blake v. Pro. Coin Grading Serv.*, 898 F.Supp.2d 365, 394 (D. Mass. 2012) (quoting *IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 583–84 (7th Cir. 2002)).

screw tops does not constitute a trade secret—none of that is proprietary to Ecolab or even confidential.  Nor could Ecolab credibly argue that such run-of-the-mill packaging configurations and/or specifications could not be reverse engineered.  Mass. Gen. Laws Ann. ch. 93, § 42(1) (no misappropriation if alleged trade secret can by acquired through "reverse engineering from properly accessed materials or information").  But if these examples are not what Ecolab means by "packaging specifications," it must say so in its Complaint.  Otherwise, the Court cannot properly evaluate whether this information constitutes a trade secret.

This deliberate overly broad vagueness pervades throughout Ecolab's litany of alleged trade secrets, including its vague references to "test methods" and "test specifications."  *Id.* Without more detail, Webco cannot possibly be said to have been placed on notice of what protectable trade secret it is accused of misappropriating.  *Flexible Techs., Inc.*, 2019 WL 1417465, at *2; *cf. Oakwood Laboratories, LLC v. Thanoo*, No. 17-CV-05090(PGS), 2017 WL 5762393, at *2, 4 (D.N.J. Nov. 28, 2017) (dismissing misappropriation claim related to, in relevant part, "testing processes" because the complaint failed to "identif[y] or point[] to a specific action, process, or formula" that was misappropriated).  Nor can the Court determine from these allegations the "nature" of the alleged trade secrets or "whether misappropriation has or is threatened to occur."  *Flexible Techs., Inc.*, 2019 WL 1417465, at *2; *see* Mass. Gen. Laws Ann. ch. 93, § 42D.  Because the Complaint does not plead the existence of a trade secret with sufficient particularity, its claims under the DTSA and the MUTSA must be dismissed.

### ii.    Ecolab's Alleged Trade Secrets Are Public Knowledge.

Ecolab's DTSA and MUTSA claims must also be dismissed because, regardless of what they are, any alleged trade secrets are necessarily either already known to the agricultural industry or are readily ascertainable through Ecolab's public patents and underlying applications. As such, they do not meet the definition of a trade secret under the DTSA and the MUTSA.

10

"Matters of public knowledge or of general knowledge within an industry cannot be trade secrets." *Moog, Inc.*, 2020 WL 6162921, at *7.  Information cannot constitute a trade secret under the DTSA and MUTSA unless it derives "independent economic value" from "not being generally known to, and not being readily ascertainable through proper means by" another person.  18 U.S.C.A. § 1839(3)(B); Mass. Gen. Laws Ann. ch. 93, § 42(4)(i) (information must provide "economic advantage" from "not being generally known to, and not being readily ascertainable by proper means by" another person).

Stated another way, a plaintiff must "adequately distinguish[ ] that which is public knowledge from the trade secrets that [defendant] allegedly misappropriated." *Moog, Inc. v. ClearMotion, Inc.*, 2020 WL 6162921, at *7.  That dooms Ecolab's Complaint as pled.

As an initial matter, the use of teat dip to control bovine mastitis is long known and not unique or confidential to Ecolab, which voluntarily disclosed its alleged trade secrets through its patents and/or patent applications.  Indeed, Webco has long formulated and manufactured teat dip product for the agricultural industry.  As noted above, Webco is the assignee of the '344 patent that predates the license agreement between Plaintiffs and IBA.  Decl. of Christine K. Bush ("Bush Decl."), Ex. A (a true and accurate copy of the '344 patent).  Although the '344 patent is an example of just one teat dip, there are numerous expired patents and industry publications available to the public that disclose the use of other chemicals used for forming a stable, effective composition that can be used to prevent bovine mastitis.

For example, Ecolab is the assignee of another expired patent (U.S. Patent No. RE41,279) that lists numerous industry publications available as of the **2006** filing date (*i.e.,*

almost 20 years ago) directed to teat dip compositions.[4]  *See* Bush Decl., Ex. B (a true and accurate copy of U.S. Patent No. RE41,279), at pp. 1-2 ("References Cited" and "Other Publications").  That now-expired patent publicly discloses that many competing types of teat dips had been developed as of that filing, beyond the acidified sodium chlorite ("ASC") teat dip Ecolab claims is at the heart of this case, including iodophors, quaternary ammonium compounds, chlorhexidine salts, chlorine release compounds (e.g. alkali hypochlorites), oxidizing compounds (e.g. hydrogen peroxide, peracids), protonated carboxylic acids (e.g. heptanoic, octanoic, nonanoic, decanoic, undecanoic acids), acid anionics (e.g. alkylaryl sulfonic acids), and chlorine dioxide (from chlorite).  *See generally id.* at col. 2:26-54.

Further, this patent publicly discloses the use of dyes as a visual indicator of which teats had been treated, plus specific examples of the numerous "compositions" of the ingredients that are useful at controlling bovine mastitis, and specifically lays out the "guidelines for consistent concentrations in accordance" with the invention that is subject to the patent.  *Id.* at col. 6:14-col. 10:19 ("Brief Description of the Invention").  The specifications disclose percentages and weights of separate ingredients, as well as the "[m]ixing instructions" and procedures for testing and producing the product, including the recommended speed used to pour in the ingredients (*e.g.*, "slowly add item," "continue agitation at a slow addition rate," *id.* at col. 42), the temperature of the ingredients and apparatuses (*e.g.*, *id.* at cols. 33-34, 51), and the recommended equipment to use (*e.g.*, "600 ml beaker," "Brookfield RVT Viscometer," etc., *id.* at col. 51).  *See generally id.* at cols. 23-54.

---

[4] Ecolab lists several other patents in Exhibit A to its licensing agreement with IBA.  *See* ECF No. 1-1 at 14.

Additionally, in 2012, Ecolab filed a Petition for the Evaluation of the Substance – *Acidified Sodium Chlorite (ASC) Solutions for Inclusion on the National List of Substances Allowed in Organic Livestock Production* with the USDA.  Bush Decl., Ex. C (a true and accurate copy of Ecolab's Petition for the Evaluation of Substance).[5]  In its cover letter to that extensive submission, Ecolab wrote that "The use of Acidified Sodium Chlorite (ASC) Solutions has a long history of safe, functional, and effective use in direct-contact sanitation and livestock teat dip preventative applications. It has been thoroughly researched, tested, and documented and approved for use by several domestic and foreign food and livestock agencies . . . ."  *Id.* at p. 1. The submissions referenced provisions from the Code of Federal Regulations specific to the chemistry of ASC (*id.* at pp. 9-12), explained the composition solutions (*id.*, at pp. 12-14), described the manufacturing processes (*id.*, at p. 14), and attached reams of backup, all relating to manufacturing ASC teat dip.  *See generally id.*

Beyond information disclosed in dozens of patents and in public regulatory filings, Ecolab, Webco and other manufacturers and sellers of this type of product have safety data sheets for their products.  In ¶ 36 of its Complaint, for example, Ecolab complains that the Non-Ecolab Product Opti-Guard is "marketed as an equivalent to Ecolab's Gold Aztec teat dip product."  Compl. ¶ 36.  But Ecolab Safety Data sheet for that Aztec Gold product discloses that the product is comprised of percentages of glycerin and lactic acid.  Bush Decl., Ex. D (a true and accurate copy of Ecolab's Aztec Gold Safety Data Sheet).  Here, for example, Ecolab cannot be claiming that manufacturing a teat dip product that includes those chemicals in those

---

[5] Available at https://www.ams.usda.gov/sites/default/files/media/S%20Chlorite%20Acidified.pdf  (last accessed October 22, 2024).

percentages is a protectable Ecolab trade secret, but its non-specific Complaint could arguably be read that broadly.

The Complaint does nothing to demonstrate that the alleged trade secrets at issue here are not already known or readily ascertainable.  *See Insulet Corp. v. EOFlow, Co.*, 104 F.4th 873, 882 (Fed. Cir. 2024) (information that has "become matters of public knowledge either through a patent disclosure or otherwise" are "unlikely to merit trade secret protection").  Nor does the Complaint do anything to "separate the [purported] trade secrets from the other information . . . [that was] known to the trade."  *TLS Mgmt. & Mktg. Servs., LLC v. Rodriguez-Toledo*, 966 F.3d 46, 54 (1st Cir. 2020) (internal quotation marks omitted) (alterations in original).  Accordingly, as alleged, none of this information rises to the level of trade secret under the DTSA and the MUTSA.  *See SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("In a trade secret case, [s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status." (internal quotation marks omitted)).  Ecolab's claims must therefore be dismissed.

### iii.    Ecolab Fails to Allege Sufficient Facts Demonstrating That Webco Used Ecolab's Alleged Trade Secrets.

Finally, Ecolab's misappropriation claims must be dismissed because the Complaint fails to adequately allege that Webco misappropriated—*i.e.*, used—Ecolab's alleged trade secrets in connection with the development of allegedly competitive products, Ultra-Guard HV, Pro-San, Pre-Sept, and Opti-Guard.  *Incase Inc.*, 488 F.3d at 52 (to state a claim under either the DTSA or the MUTSA, a plaintiff must plead facts demonstrating that plaintiff "use[d] the trade secret").

Ecolab does not allege any specific facts demonstrating ***how*** Webco used Ecolab's alleged trade secrets in connection with developing Ultra-Guard HV, Pro-San, Pre-Sept, and

Opti-Guard.  Instead, it alleges that Webco and IBA had Ecolab's alleged trade secrets "in their possession" and "Webco was simultaneously manufacturing" Ecolab teat dip products pursuant to the license agreement at the time Webco and IBA developed the Non-Ecolab Products. Compl. ¶ 39.  Ecolab further alleges, "upon information and belief," that each of the Non-Ecolab Products are "marketed as an equivalent" to an Ecolab teat dip product, and that each took less time to develop than the Ecolap teat dip products.  *Id.* ¶¶ 33-36, 40-43.  Ecolab then concludes, again "upon information and belief," that IBA and Webco "were only able to launch [the Non-Ecolab Products] so quickly because of their access to and use of [Ecolab's alleged trade secrets.]"  *Id.* at 44.

These allegations fail to demonstrate ***how*** Webco used Ecolab's alleged trade secrets. Access to alleged trade secrets, standing alone, does not constitute misappropriation.  *See Analog Techs., Inc. v. Analog Devices, Inc.*, 105 F.4th 13, 18-19 (1st Cir. 2024) (no misappropriation where defendant had unrestricted access to trade secrets following expiration of confidentiality agreement).  And courts have recognized that that there is "no legal authority for the proposition that a mere coincidence in timing can support an inference of trade secret use."  *Spear Mktg., Inc. v. BancorpSouth Bank*, 791 F.3d 586, 601 (5th Cir. 2015); *My Mavens, LLC v. Grubhub, Inc.*, No. 20 CIV. 4657 (PGG), 2023 WL 5237519, at *23 (S.D.N.Y. Aug. 14, 2023) (same). Nor can a plaintiff base its claim merely on "the coincidence of timing and on the fact that [the defendant's products] perform the same general function."  *Spear Marketing*, 791 F.3d at 601-02; *see Torsh Inc. v. Audio Enhancement, Inc.*, 661 F.Supp.3d 596, 604 (E.D. La. 2023).

Accordingly, to adequately plead a misappropriation claim, a plaintiff must plead "how [defendant's] products have incorporated [plaintiff's] trade secrets."  *Phazr, Inc. v. Ramakrishna*,

No. 3:19-CV-01188-X, 2020 WL 5526554, at *5 (N.D. Tex. Sept. 14, 2020).  Ecolab fails to do so.

For example, while the Complaint alleges that the Non-Ecolab Products are "marketed" as "equivalent(s)" to Ecolab's own products, it does not bridge the gap between that statement and Webco's use of any protectable trade secrets.  Here, for example, Ecolab focuses on its UDDERgold products and claims that "Ultra-Guard HV is an ASC teat dip product recommended for post-milking use and is, upon information and belief, marketed as an equivalent to Ecolab's UDDERgold family of ASC teat dip products."  Compl. ¶ 33.  But Ecolab's 2017 publicly available filing with the United States Patent and Trademark Office for the UDDERGOLD trademark included an exemplar of the product's label that discloses, for example, that it includes active ingredients of alpha-hydroxy acids ["mixture of lactic acid and mandelic acid"] (1.7%), and a skin conditioning system that contains glycerin, PEG-75 lanolin (6.0%).  Bush Decl., Ex. E at p. 10 (a true and accurate copy of Trademark Registration No. 1462481).  So manufacturing a teat dip product with those configurations, marketed as an equivalent to UDDERGOLD, does not, as a matter of law, implicate trade secrets.

Ecolab does not allege that IBA and Webco used the same "product specifications" or "methods of manufacture" of Ecolab's teat dip products.  Compl. ¶ 21.  Nor does it allege that IBA and Webco used the same "sources" and "specifications" for raw materials as Ecolab in connection with developing the Non-Ecolab Products.  *Id.*  Likewise, Ecolab does not specifically allege that IBA and Webco used the same test methods and testing specifications, batch specifications, batch cards, and historical batch testing statistics as Ecolab's teat dip products for the Non-Ecolab Products.  *Id.*  And finally, Ecolab does not allege that IBA and

16

Webco use the same packaging specifications, "bills of materials," or "commercialized formulas" as Ecolab's product when developing the Non-Ecolab Products.  *Id.*

In other words, Ecolab simply does not plead ***how*** IBA and Webco incorporated Ecolab's alleged trade secrets into the Non-Ecolab Products.  Nor could it.  As noted above, Webco's knowledge and development of teat dip products pre-dates the license agreement between Ecolab and IBA.  Moreover, teat dip products are well known in the industry, and come in a variety of compositions.  Ecolab has not—and cannot—allege facts, as required by federal pleading standard, that would permit the inference that the Non-Ecolab Products are based on Ecolab's trade secrets, rather than on Webco's own knowledge or research and development of the product.

Accordingly, Ecolab's allegations, at most, only permit the Court to infer the "mere possibility" of misconduct.  *Maldonado*, 568 F.3d at 268.  This is not sufficient to state a claim for relief.  *Phazr, Inc.*, 2020 WL 5526554, at *4 ("Without that vital *how*, [plaintiff] cannot elevate its pleading from the conclusory to the plausible" (emphasis in original)); *see, e.g.*, *MedQuest Ltd. v. Rosa*, No. 21 CIV. 5307 (PGG), 2023 WL 2575051, at *6 (S.D.N.Y. Mar. 20, 2023) (dismissing claim because "speculative allegations" based "upon information and belief" are "not sufficient to allege misappropriation of a trade secret"); *Ad Lightning Inc. v. Clean.io, Inc.*, No. 19-CV-7367 (JPO), 2020 WL 4570047, at *4 (S.D.N.Y. Aug. 7, 2020) ((dismissing DTSA claim where allegations of misappropriation were "merely consistent with" defendant's liability).

Ecolab's MTSA and MUTSA claims must therefore be dismissed.

**B.** **ECOLAB'S c. 93A MUST BE DISMISSED**

Ecolab's claim for a violation of c. 93A rests entirely on the same allegations as its misappropriation claims. *See* Compl. ¶ 73 ("Defendants knowingly and willfully engaged in unfair or deceptive trade practices in violation of Mass. Gen. Laws Ann. ch. 93A by misappropriating the Ecolab Trade Secret and using them in the marketplace to compete with Ecolab").  Because Ecolab fails to state a claim under either the DTSA or the MUTSA, its 93A claim also necessarily fails and must be dismissed.

Moreover, even if Ecolab's MUTSA claim was to survive dismissal (it should not), Ecolab's 93A claim still fails because it would be preempted by Ecolab's MUTSA claim.

The MUTSA provides that it "shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret," excluding "contractual remedies" and "civil remedies ***to the extent that they are not based upon misappropriation of a trade secret***." Mass. Gen. Laws Ann. ch. 93, § 42F (emphasis added).  As noted, the Complaint makes clear that Ecolab's 93A claim is based ***entirely upon*** the alleged misappropriation of one or more trade secrets.  Accordingly, the c. 93A claim is preempted by the MUTSA.

**V.**   **CONCLUSION**

For the foregoing reasons, Webco respectfully requests that the Court dismiss all claims against it.

Respectfully submitted,

WEBCO CHEMICAL CORPORATION,

By its attorneys,

Dated:   November 1, 2024

*Christine K. Bush*
Christine K. Bush (BBO No. 635381)
Hinckley, Allen & Snyder LLP
100 Westminster Street, Suite 1500
Providence, RI 02903-2319
T: (401) 274-2000
F: (401) 277-9600
cbush@hinckleyallen.com

John A. LeBlanc (BBO No. 704135)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, MA   02109-1776
T:  (617) 345-9000
F:  (617) 345-9020
JLeBlanc@hinckleyallen.com

## CERTIFICATE OF SERVICE

I, John A. LeBlanc, do hereby certify that on this 1st day of November, 2024, this document was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

*/s/ John A. LeBlanc*
John A. LeBlanc

19