UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ECOLAB INC. and ECOLAB USA INC., <br> Plaintiffs, <br><br> v. <br><br> IBA, INC. and WEBCO CHEMICAL CORPORATION, <br> Defendants. | Civil No. 4:24-CV-40107 |

### ORDER ON DEFENDANTS' MOTIONS TO DISMISS [ECF. Nos. 27, 30]

**GUZMAN, J.**

This is a trade secrets action where Plaintiffs, Ecolab Inc. and Ecolab USA Inc. (collectively "Ecolab" or "Plaintiffs"), assert that Defendants, IBA, Inc. ("IBA") and Webco Chemical Corporation ("Webco") misappropriated trade secrets and confidential information related to acidified sodium chlorate bovine teat-dip products. Ecolab filed this four-count lawsuit against the Defendants for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), unfair competition in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11, and common law breach of contract. [See Compl., ECF No. 1].

Defendants IBA and Webco move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), relying on three main arguments: (1) that the Plaintiffs are claim splitting between Massachusetts and a pending Minnesota action, (2) that the claims fail due to insufficient pleading, and (3) that the Massachusetts state claims are pre-empted by the trade secrets statutes brought in this case. [See ECF Nos. 27, 30]. Having carefully considered the pleadings filed in Massachusetts and

1

Minnesota,[1] oral argument, and the applicable law, for the reasons stated below, the Court **GRANTS** Defendants' Motions to Dismiss. [ECF Nos. 27, 30].

## I.     BACKGROUND

The following relevant facts are taken primarily from the allegations in Plaintiffs' Complaint and are accepted as true for purposes of this motion. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (explaining that a reviewing court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."). All plausible inferences are made in Plaintiff's favor. Id.

### A. Relevant Facts

Ecolab, IBA, and Webco are corporations which provide products and services to the dairy industry. At the core of this case are Ecolab's acidified sodium chlorite ("ASC") teat dip products. [Compl. ¶ 1]. Ecolab, and its predecessor-in-interest Alcide Corporation ("Alcide"), developed, manufactured, and tested these ASC teat dip products over many years. [Id. ¶ 2]. As many large corporations do, Ecolab contracted with other businesses to support the manufacture and distribution of their products. Beginning in 2002, Ecolab contracted via license agreement with Defendant IBA to distribute Ecolab ASC teat dip products ("Covered Products"). [See id. ¶ 25-27]. Under this agreement, Ecolab authorized IBA to "make, have made, use, sell, and import" its ASC products using its patent and trademark rights, "trade secrets, technical reports and proprietary data." [Id. ¶ 81; ECF No. 1-1 §§ 1.5-2.1]. IBA pursuant to the license agreement with

---

[1] This Court may consider "facts that are matters of public record or otherwise susceptible to judicial notice." Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 543 (1st Cir. 2021). Proceedings in other courts may be subject to judicial notice, particularly in actions where Defendants bring arguments of res judicata or claim-splitting. Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

Ecolab used Defendant Webco as a third-party to manufacture teat dip products for Ecolab. [Compl. ¶¶ 3, 29; ECF No. 1-1 § 2.5; ECF No. 1-4 § 2.1]. Webco, as a third-party manufacturer, was under "the same confidentiality provisions agreed to by IBA." [Compl. ¶¶ 3]. This licensing agreement was renewed four times, ultimately lapsing on May 31, 2019. [Compl. ¶ 78; ECF No. 1-5]. For the majority of this contractual relationship, Ecolab's ASC teat dip products were under patent protection. [ECF No. 1-1]. In 2022, after two-and-a-half years of negotiations between Ecolab and IBA regarding the lapsed licensing agreement, and after the patent's expiration, Webco began manufacturing and IBA began distributing competitive ASC teat dip products ("Non-Covered Products"). [Compl. ¶ 4; ECF No. 1-5].

> i. *Trade Secrets*

In support of its trade secrets claims, Ecolab asserts that over the years, it has invested significant time and effort into developing, improving, and perfecting its ASC teat dip products and the methods of manufacturing. [Id. ¶ 18]. These efforts were time-intensive, often taking approximately three to four years to bring a product to market. [Id. ¶ 20]. The "Ecolab Trade Secrets," include the following:

> [P]roduct specifications for and methods of manufacture of ASC teat dip products; specifications for raw materials used in the manufacture of ASC teat dip products; the sources and vendors of raw materials used in the manufacture of ASC teat dip products; test methods and testing specifications used in connection with the manufacture and testing of ASC teat dip products; batch specifications, batch cards, and historical batch testing statistical results relating to ASC teat dip products; packaging specifications for ASC teat dip products; the selection, importance, and benefits of using certain materials and methods in the manufacture of ASC teat dip products; and bills of materials and commercialized formulas related to the manufacture of ASC teat dip products.

[Compl. ¶ 21]. Ecolab claims that it has taken reasonable steps to maintain the confidential nature of these Trade Secrets, including:

> [R]equiring employees to sign confidentiality agreements, requiring visitors to sign in and out and be escorted through the premises, restricting access to certain portions of the buildings to certain employees, restricting the use of cameras and other recording devices while on the premises, and requiring independent contractors and partners to sign nondisclosure agreements.

[See Compl. ¶¶ 22, 48, 60]. Ecolab alleges that IBA and Webco used the Ecolab Trade Secrets in connection with the development, formulation, validation, testing, and manufacture of non-Ecolab ASC teat dip products. [Id. ¶¶ 32-36]. It asserts that at the time of the non-covered product development, the Defendants had in their possession the Ecolab Trade Secrets and Webco was simultaneously manufacturing Ecolab ASC teat dip products in violation of their previous licensing agreement. [Id. ¶ 39]. The parties assert that these non-Ecolab products were sold as early as January 2022 and now directly compete with Ecolab products. [Id. ¶¶ 40-43, 45].

### B. Procedural History

This legal dispute began in the District of Minnesota in February 2022 when Ecolab discovered that IBA was selling non-covered ASC teat dip products and filed suit. [Id.]; see Ecolab Inc. et al. v. IBA, Inc. et al., No. 22-cv-00479-ECT-DTS (D. Minn.) ("Minn. Action"), ECF No. 1. In the Minn. Action, Ecolab alleged six counts including breach of contract, misappropriation of trade secrets under the DTSA, misappropriation of trade secrets under the Minnesota Uniform Trade Secrets Act, trademark infringement, federal unfair competition, and unfair competition under Minnesota law. Minn. Action, ECF No. 1. In April 2023, after opposition briefing and oral argument, the Minnesota court granted Ecolab leave to amend its complaint to expand the temporal scope of the complaint and to include Webco Inc. and Custom Chemical Formulators, Inc. ("Custom Chemical") as defendants. See Minn. Action, ECF Nos. 47-57, 60-61. Webco and Custom Chemical were later dismissed from the action on personal jurisdiction grounds. Minn Action, ECF No. 179. In October 2023, Ecolab filed a Motion to Compel against IBA asserting

4

that the corporate defendant was engaging in delay tactics and refusing to provide documents on the non-covered ASC product development. Minn. Action, ECF No. 180. Ecolab sought to compel IBA to provide "three categories of discovery: (1) requests related to IBA's Non-Covered Products, (2) documents in the possession, custody, or control of Webco and Custom Chemical; and (3) supplementation of responses required under the rules." Minn. Action, ECF No. 247 at 5. IBA argued it provided the information relevant to the marketing and initial sales of the Non-Covered Products at issue but argued that discovery of the development and manufacturing of these products were "competitively sensitive and outside the scope of claims pleaded in the Amended Complaint." Id. at 6. After oral argument before the Magistrate, Magistrate Judge Schultz granted the motion in part and denied in part. Id. at 7.

Magistrate Judge Schultz determined that Ecolab was "judicially estopped" from claiming that the Amended Complaint "intended to allege IBA misappropriated Ecolab's trade secrets by developing and manufacturing Non-Covered Products too." Id. at 12. In other words, the Magistrate determined that Ecolab's allegations in the Amended Complaint did not include the development and manufacture of IBA products, therefore, Ecolab was not entitled to discovery on that topic. The Magistrate read the Amended Complaint narrowly, relying on the pleadings and oral arguments of the parties for the motion to amend. Id. Ecolab submitted objections to the Magistrate's determination, claiming that his order was beyond a mere discovery issue but ultimately a dispositive action precluding claims of trade secret misappropriation for IBA products in its case. Minn. Action, ECF No. 264. On July 17, 2024, the District Judge affirmed the Magistrate's limitation of discovery, determining that Ecolab's Amended Complaint did "not assert a claim based on IBA's development or manufacture of its own teat-dip products." Minn. Action, ECF No. 287 at 2.

Ecolab subsequently filed a separate action in this Massachusetts District Court against IBA and Webco on August 14, 2024, pursuing claims of trade secret misappropriation and breach of contract related to the non-covered ASC products or "IBA products" – the very products on which the Minnesota court precluded discovery. [Compl.] After several extensions, Webco and IBA filed their Motions to Dismiss under Rule 12(b)(6). [ECF Nos. 27, 30]. Ecolab opposed both motions and the parties filed their respective replies and sur-replies on the motions. [ECF Nos. 34, 35, 38, 39, 43]. The Court heard oral argument on the motions on June 10, 2025, [ECF No. 45], and subsequently implemented a stay for the parties to pursue the action in Minnesota. At a status conference on October 9, 2025, Ecolab requested the Court lift the stay in part because a delay in discovery may preclude Plaintiff from a necessary deposition of a previous executive of Webco who had reportedly been suffering medical complications. [ECF No. 49]. This Court lifted the stay to address the pending motions to dismiss. [ECF No. 50].

## II. LEGAL STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). When deciding a 12(b)(6) motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Grajales v. P.R. Ports Auth., 682 F. 3d 40, 44 (1st Cir. 2012). "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 13 (1st Cir.

2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n] '—that the pleader is entitled to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

### III.    DISCUSSION

#### A. Claim splitting allegation made by IBA.

Defendants IBA and Webco argue that there is substantial overlap and nearly identical allegations asserted in the proceedings in Minnesota as introduced to this Court, amounting to improper claim splitting. Defendants argue that Ecolab is attempting to attain a "second bite at the apple," for its denied motion to compel regarding IBA product development. [ECF No. 38 at 5]. Ecolab opposes these allegations, arguing that the claims in each court are materially different because the Massachusetts action is focused on the IBA products, and the Minnesota action is focused on Ecolab products. [ECF No. 35 at 6]. Ecolab attests that it has the right to pursue its claims against the parties misappropriating its trade secrets.

The First Circuit has described the claim-splitting doctrine as "one application of the general doctrine of res judicata," or claim preclusion. Sutcliffe Storage & Warehouse Co. v. United States, 162 F.2d 849, 852 (1st Cir. 1947); Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp., 296 F.3d 982, 986 (10th Cir. 2002) ("[R]ecent cases analyze claim-splitting as an aspect of res judicata."). In Massachusetts,

> [c]laim preclusion applies if (1) the earlier suit resulted in a final judgment on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently identical or related, and (3) the parties in the two suits are sufficiently identical or closely related.

Airframe Sys. v. Raytheon Co., 601 F.3d 9, 14 (1st Cir. 2010) (citing Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 329 (1st Cir. 2009); Negron-Fuentes v. UPS Supply Chain Solutions, Inc., 532 F.3d 1, 10-11 (1st Cir. 2008); Apparel Art Int'l v. Amertex Enters., 48 F.3d 576, 583-84 (1st Cir. 1995)).

The Tenth Circuit has articulated that "the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit." Katz v. Gerardi, 655 F.3d 1212, 1218 (10th Cir. 2011); see also Brady v. UBS Fin. Svc., Inc., 538 F.3d 1319, 1327 n.10 (10th Cir. 2008) ("The first suit need not reach final judgment before a motion to dismiss based on improper claim splitting can be granted."). Claim splitting is viewed as a district court's obligation to manage its docket efficiently, "whereas res judicata focuses on protecting [the] finality of [court] judgments." Katz, 655 F.3d at 1218. However, both procedural limitations "serve the same interests of promoting judicial economy and shielding parties from vexatious concurrent and duplicative litigation." Id.

In a claim splitting action, the two prongs a court must analyze are (1) whether the causes of action asserted are sufficiently identical or related, and (2) whether the parties in the two suits are sufficiently identical or related. Hatch v. Trail King Indus., 699 F.3d 38, 45 (1st Cir. 2012). Whether an action is duplicative of another depends on whether the "claims, parties, and available relief do not significantly differ between the two actions." Serlin v. Arthur Andersen & Co., 3 F.3d 221, 223 (7th Cir. 1993). When claim splitting occurs, a district court may "stay the second suit, dismiss it without prejudice, enjoin the parties from proceeding with it, or consolidate the two actions." Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000).

     *i. The Causes of Action are sufficiently related*

In the First Circuit, courts follow a transactional approach in a claim-splitting analysis "to determine whether causes of action are sufficiently related." Labranch v. United States Liberty Ins.

Co., 786 F. Supp. 3d 262, 276 (D. Mass. 2025) (citing Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 38 (1st Cir. 1998)). A party may bring a single cause of action through different claims under federal statutes, state statutes, or the common law; however, if the "different theories of recovery, howsoever prolific, derive from the same cause of action, the requisite identity is achieved if . . . all such theories concern 'the same operative nucleus of fact.'" Kale v. Combined Ins. Co., 924 F.2d 1161, 1166 (1st Cir. 1991) (citing Lovely v. Laliberte, 498 F.2d 1261, 1263 (1st Cir. 1974)). If the claims asserted in a pending action and the current action, are "sufficiently related, that is if they were founded upon the same transaction, arose out of the same nucleus of operative facts, and sought redress for essentially the same basic wrong, the two suits advance[] the same cause of action notwithstanding any differences in remedies sought or theories of recovery pleaded." Kale, 924 F. 2d at 1166. Therefore, the inquiry of whether "the causes of action arise out of a common nucleus of operative facts . . . is whether the facts are related in time, space, origin, or motivation." Labranche, 786 F. Supp. 3d at 276 (citing Salvati v. Fireman's Fund Ins. Co., 368 F. Supp. 3d 85, 94 (D. Mass. 2019)).

      Here, Ecolab asserts that the two actions "pertain to two entirely different wrongs based on distinct operative facts." [ECF No. 35 at 6]. Ecolab argues that the same *products* are not at issue between the two cases. Ecolab differentiates the Minnesota action as an issue of "Ecolab Products" versus the Massachusetts action as "IBA products." [Id.] According to Ecolab, the Minnesota action focuses on the Ecolab products that were manufactured and distributed after the license agreement, and the fact that IBA products were manufactured and distributed while the defendants had access to Ecolab's Trade Secrets, in breach of the one-year notice and noncompete provision of the licensing agreement between IBA and Ecolab. [Id. at 6]. The Minnesota action is also focused on the marketing and sale of the IBA products.

Ecolab argues that the Massachusetts action is materially different because it asserts that IBA and Webco **used** Ecolab Trade Secrets in the development, manufacturing, and distribution of IBA products. [Id. at 3]. Ecolab states that due to the products' rapid market release the Defendants *must* have developed and manufactured these products *using* the Ecolab Trade Secrets. [See Compl. ¶ 44].

Ecolab additionally argues that the facts asserted in this Court are sufficiently distinct to the Minnesota case because the Magistrate determined that those facts are "so unrelated [that] they cannot even be the subject of discovery," in the Minnesota action. [ECF No. 35 at 1]. This Court does not read the Magistrate's opinion to discount any and all relevance to those claims. Looking to the Magistrate's Order, it is clear that he narrowed the scope of discovery because "the Amended Complaint challenged only IBA's marketing and selling of non-Ecolab-branded products, not its manufacturing or development of them." Minn. Action, ECF No. 287 at 9. The Magistrate Judge did not make any determinations of whether a claim against IBA for the development of their products could be related to this action, only that Plaintiff did not adequately plead the issue in its Amended Complaint, motion to amend, or motion hearing on the issue, and was therefore not entitled to discovery on it. Id.[2]

---

[2] "As originally pleaded, Ecolab's misappropriation claim related only to Covered Products. Though the section Ecolab added to the Complaint uses 'products,' instead of specifying 'Covered' or 'Non-Covered' products, Ecolab's representation to the Court confines this reference to Covered Products. Ecolab assured the Court that its Amended Complaint 'cover[ed] the same set of Ecolab products' and 'd[id] not add any new claims,' but 'merely expand[ed] the temporal scope of [its] claims that are already a part of the case.'" Minn. Action, ECF No. 247 at 12 (citing ECF No. 204 at 6).
"To the extent Ecolab now argues that it intended to expand its misappropriation claim to include Non-Covered Products and that its use of the word "products" (as opposed to "Covered Products") was meant to convey that intent, it is contrary to the express representation Ecolab made to this Court and the Court finds the argument unpersuasive." Minn. Action, ECF No. 247 at 12 n. 7.

The claims in the Minnesota action and the Massachusetts action undisputedly arise out of a common nucleus of operative facts, as "the facts are related in time, space, origin, or motivation." Labranche, 786 F. Supp. 3d at 276 (citing Mass. Sch. of L. at Andover, 142 F.3d at 38). Both lawsuits stem from the same license agreement and potential breach of contract; both cases cover the temporal scope of the parties' relationship between 2002 and 2022; Ecolab asserts that the exact same trade secrets (verbatim between complaints) are at issue in this case; and finally, the original filing of the Minnesota action was catalyzed by the sale of the same products which are in dispute in the Massachusetts action. See Airframe Sys., 601 F. 3d at 15 (holding that claims which arose "from the same common core facts and in the same time frame" share a common nucleus of operative facts.). The Minnesota action's denial of Ecolab's motion to compel regarding the manufacture and development of IBA products has no bearing on this Court's determination that the claims are sufficiently related to constitute claim splitting. As the overlapping facts articulated above demonstrate, the claims in the Minnesota action are aligned in "time, space, origin, or motivation" with the claims in this case. Labranche, 786 F. Supp. 3d at 276 (citing Mass. Sch. of L. at Andover, 142 F.3d at 38).

  *ii. The parties are sufficiently related.*

In this case, as in Minnesota, Ecolab is the Plaintiff and IBA is named as a defendant. What differs in this action is that the Massachusetts court may properly exercise personal jurisdiction over Webco as a defendant.

Res judicata prohibits claim splitting by "parties to an original action and those in privity with such parties." Doe v. Urohealth Sys., 216 F.3d 157, 161 (1st Cir. 2000). In litigation, "party" is "one by or against whom a lawsuit is brought." Smith v. Bayer Corp., 564 U.S. 299, 313 (2011) (cleaned up). In the First Circuit, "privity is a sufficient but not a necessary condition for a new

11

defendant to invoke a claim preclusion defense," as "claim preclusion applies if the new defendant is 'closely related to a defendant from the original action – who was not named in the previous lawsuit.'" Airframe Sys., 601 F.3d at 17 (citing Negron-Fuentes, 532 F. 3d at 10 (collecting cases)); In re El San Juan Hotel Corp., 841 F.2d 6, 10-11 (1st Cir. 1988) (holding that the new defendant, an alleged co-perpetrator of the financial harms litigated in the first lawsuit, had a sufficiently close relationship to the original defendant so as to invoke claim preclusion as a defense). A non-party to the original suit, "may be bound by [the] prior judgment if that party substantially controlled or [was] represented by a party to the original action." Urohealth Sys., 564 U.S. at 162 (quoting Com. Union Ins. Co. v. Pelchat, 727 A.2d 676, 680 (R.I. 1999)). To determine privity, "courts often look to the commonality of their interest in the matter." Urohealth Sys., 564 U.S. at 162.

Although Ecolab in this suit "changes the causes of action and adds new parties as Defendants, 'the conduct that underbraces the two sets of claims is strikingly similar in time, space, origin, and motivation.'" Labranche, 786 F. Supp. 3d 262, 276 (D. Mass. 2025). IBA is a named defendant in both actions. Id. (holding that "the analysis regarding the identity of the parties requires minimal examination," because the defendant is clearly named in both suits.)

The doctrine of claim preclusion "requires [a party] to live with [its strategic] choices." Airframe Sys., Inc., 601 F.3d at 11. Ecolab chose to file this case in Minnesota, even though it knew that IBA was incorporated and had its principal place of business in Massachusetts, [Compl. ¶ 8]; Minn. Action, ECF No. 61, and that Webco was a third-party manufacturer for its products and is also incorporated and has its principal place of business in Massachusetts. [Compl. ¶ 10; ECF No. 1-1, §§ 2.2, 2.5]. It is foreseeable that, in an action alleging the improper manufacture and distribution of corporate products, that the suit may include the product's manufacturer.

Webco from the beginning of the Minnesota suit, and even after dismissal, remains a relevant party in the action. A year after the suit was filed in Minnesota, and within the period specified in the parties' Scheduling Order, Ecolab moved for leave to amend its complaint to include Webco. Minn. Action, ECF No. 49. In the motion to amend, Ecolab noted that Webco was a contract manufacturer of the products at issue in the case against IBA, and stated that throughout the discovery process, Ecolab submitted formal discovery requests in the form of subpoenas to Webco for information on the matter. Id. at 3. It also asserted that Webco had received Ecolab's termination letter on January 6, 2022. Id. Webco, after dismissal, remains involved in the Minnesota action as a third party in the discovery process. [ECF No. 28 at 4]. These facts persuade the Court that Webco is sufficiently related to the Minnesota action and not some unrepresented actor in this legal battle.

Defendant Webco's addition to this action does not cure the reality that these cases are intertwined in fact and in potential liability. Consequently, Webco's addition does not defeat the claim splitting analysis.[3] Defendant Webco's dismissal from the Minnesota suit for lack of personal jurisdiction does not allow Ecolab to refile this controversy in Massachusetts against both parties, particularly when Ecolab strategically chose Minnesota and could have filed suit in Massachusetts from the beginning. See United Elec., Radio & Mach. Workers v. 163 Pleasant Str. Corp., 960 F.2d 1080, 1088-89 (1st Cir. 1992).

---

[3] "Logic suggests that the doctrine [of claim preclusion] can achieve its goals only if its preclusive effects occasionally can reach persons who, technically, were not parties to the original action. The pitfalls of a more mechanical rule are obvious; making party status a *sine qua non* for the operation of res judicata opens the door to countless varieties of manipulation, including claim splitting, suits by proxy, and forum shopping." See Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 757 (1st Cir. 1994).

Therefore, this Court is persuaded that the parties are sufficiently related for purposes of claim preclusion.

> *iii. Ecolab did not exhaust the proper procedural avenues in the Minnesota action.*

After Ecolab received an undesirable result on its motion to compel, the appropriate action would have been to file a motion to amend the complaint to include pleadings on the "Non-Covered Product" claims, or to appeal the motion to compel. See Hatch, 699 F.3d at 42-43 (affirming the District Court's ruling that a subsequent action constituted impermissible claim-splitting after the parties failed to appeal a denial of the motion to amend the complaint); see also Labranche v. United States Liberty Ins. Co., 786 F. Supp. 3d 262, 276 (D. Mass. 2025) (holding that where Plaintiffs "chose not to seek leave to amend" after a scheduling order issued and "instead just filed another lawsuit," was illustrative of the conduct that the claim-splitting doctrine was "established precisely to preclude.").

Choosing the venue to file a federal suit when several are available is a strategic choice made by counsel. Other strategic choices "include whether to attempt to amend a complaint and whether to appeal a denial of such an attempt. When a party chooses to move for leave to amend its complaint and then not to appeal denial of that motion, the party 'is not entitled to a second opportunity [in a later action] to litigate [the] claim.'" Hatch, 699 F. 3d at 45 (citing Airframe Sys., Inc., 601 F. 3d at 16).

Here, Ecolab did not properly move to amend its complaint after its adverse discovery order. Instead, in its objection to the Magistrate's order, Ecolab argued that in the alternative to overruling the order to compel, the court "should grant Ecolab leave to file a Second Amended Complaint to more specifically plead such a claim." Minn. Action, ECF No. 264 at 20-21. The District Judge denied the motion *without prejudice* because Ecolab did not file a proper motion

14

under D. Minn. L.R. 15.1 and neglected to attach a proposed complaint. Minn. Action, ECF No. 287 at 14 n.5. Ecolab could have and should have filed a motion to amend their complaint after the order on their motion to compel was docketed, instead, it filed an entirely new action here in Massachusetts.[4]

Therefore, for the foregoing reasons, the Court finds that Ecolab has engaged in claim splitting in filing the present action. It would be inappropriate for this Court to rule on the merits of the pending motions to dismiss that are so similar to a pending action in Minnesota. Accordingly, the Court shall dismiss this action without prejudice. See Curtis, 226 F.3d at 138.

### IV.    CONCLUSION

For the reasons stated above, the Defendants' Motions to Dismiss, [ECF. Nos. 27, 30], are **GRANTED**. The case is **dismissed without prejudice**.

**SO ORDERED.**

Dated: November 17, 2025

                                                  /s/ Margaret R. Guzman
                                                  Margaret R. Guzman
                                                  United States District Judge

---

[4] The Court recognizes that after filing the Massachusetts suit, Ecolab requested permission from Defendants to assent to amending the complaint in Minnesota, which they declined. [ECF No. 35-2]. This is of no matter, since Ecolab could have filed a proper motion to amend with the Court who is the ultimate decision-maker, and who had dismissed the original request *without prejudice* due to a procedural error. Minn. Action, ECF No. 287 at 14 n.5.